U.S. DISTRICT COURT, EDNY

### Page 26

1  to a geographic area?
2  A. People that know each other that are friends with
3  each other that carry out that actions are, you know,
4  considered a cell and there's no cross communication.
5      THE COURT: Considered what? Cell?
6      THE WITNESS: Yeah.
7  Q. Considered a cell?
8  A. Yeah.
9  Q. How would a person who is in a cell communicate about
10 a direct action that he might have done?
11 A. You don't communicate to others in different cells.
12 Q. How would you announce that you had actually done a
13 direct action like a vandalism or a sabotage or an arson?
14 A. If you choose to, people want to publicize their
15 action because they're doing illegal things and they can't
16 go on the news and explain what they're going, so you can
17 send out anonymous messages to sympathizers, people who
18 claim to be spokespersons who want publicize their action.
19 Q. Are these anonymous E-mails called communiquTs?
20 A. Yeah.
21 Q. Have you sent out a communiquT at any time during
22 your affiliation with EFL?
23 A. Yeah.
24 Q. Did you engage in direct actions as a member of EFL?
25 A. Yes.

### Page 27

1  Q. Did anyone work with you in those direct actions?
2  A. Yeah.
3  Q. Who did?
4  A. Jared McIntyre and Connor Cash.
5  Q. When did you meet Connor Cash?
6  A. In fall or winter of 2000 at a place in Mt. Sinai
7  called the Mod Center.
8  Q. Is it M-O-D center?
9  A. Yeah.
10 Q. When you say fall or winder, do you mean towards the
11 October, November of 2000?
12 A. Yeah.
13     MR. BREWINGTON: Objection to the leading
14 component to the question.
15     THE COURT: Yes. Sustained. Don't lead.
16 Q. How old were you when you met Connor Cash?
17 A. Sixteen.
18 Q. How old was he?
19 A. Nineteen, I believe.
20 Q. How did you meet him?
21 A. Well, the place that was, every few Fridays there's
22 bands playing on around like 7 to 10 o'clock, and I was
23 walking around, and he saw a political T-shirt I had on,
24 and we sparked up a conversation and started talking and
25 we became friends.

### Page 28

1  Q. What was the T-shirt that he had on?
2  A. It said "Free Mu Mia."
3      THE COURT: Is that microphone on?
4      MR. DRISCOLL: I believe it is, your Honor, if I
5  can approach. Perhaps I can move it closer to the
6  witness.
7  Q. If you can lean in and speak directly into the
8  microphone and pull your chair up.
9      Who is Mu Mia?
10 A. An African-American journalist who some people, a lot
11 of human rights organizations see him as a political
12 prisoner.
13     THE COURT: He was a political prisoner?
14     THE WITNESS: Yeah.
15     THE COURT: Of whom? He was a prisoner of whom?
16 He was a prisoner of whom?
17     THE WITNESS: In Pennsylvania, he's been like on
18 death row for a while.
19     THE COURT: He was up here?
20     THE WITNESS: No, it was just a T-shirt that I
21 had on that says free him.
22     THE COURT: I see.
23 EXAMINATION (Continued.)
24 BY MR. DRISCOLL:
25 Q. What did Mu Mia allegedly do?

### Page 29

1      MR. BREWINGTON: Objection.
2      THE COURT: No. I'll allow it.
3  A. He's been in death row for like two decades for
4  supposedly killing a cop, but a lot of human rights
5  organizations said he didn't do it. So it's a
6  controversial issue.
7  Q. That's a T-shirt that you had on when you met Connor
8  Cash?
9  A. Yes.
10 Q. And you had a discussion with him?
11 A. Yeah.
12 Q. Did it come to pass that you ran into Connor Cash in
13 approximately October of 2000 in Port Jefferson?
14 A. Yeah.
15 Q. Tell the jury about how you met him that day.
16 A. What happened in October?
17 Q. Yes.
18 A. It was a protest in Port Jeff outside Yuppy Puppy.
19 Q. What is Yuppy Puppy?
20 A. It's a store that sells pets, sells puppies, and they
21 breed them just to sell them, so it was an animal rights
22 protest.
23     THE COURT: It was a what?
24     THE WITNESS: An animal rights protest.
25     THE COURT: At the puppy store?

U.S. DISTRICT COURT, EDNY

### Page 30

1  THE WITNESS: Yeah, because there's a lot of
2  mistreatment to animals and how they breed them for pet
3  stores and bad conditions. They just breed the mothers
4  over and over.
5  THE COURT: The puppy store does?
6  THE WITNESS: Yeah, they buy them from puppy
7  mills which are seen as cruel places for animals.
8  THE COURT: You were part of a group that was
9  protesting?
10  THE WITNESS: It was not a group. It was a
11  protest that I heard about and I wanted to go to it and
12  Connor drove me there.
13  THE COURT: Wait a second.
14  You heard about it and you wanted to go there
15  and Connor drove you there. How did that happen? How did
16  he happen to be going?
17  THE WITNESS: We were friends for a while after
18  we met and I heard about the protest and he heard about
19  it, and he was going there and I was 16, I didn't drive a
20  car, so he picked me up and went there.
21  THE COURT: I see. Okay.
22  EXAMINATION (Continued.)
23  BY MR. DRISCOLL:
24  Q. Did you meet Jared McIntyre that the demonstration?
25  A. Yes.

### Page 31

1  Q. How did you meet Jared McIntyre?
2  A. Well, after a short time Connor left the protest, I
3  don't know how long he stayed, but I was there alone,
4  didn't know anyone, and I met Jared because he had
5  political T-shirt, buttons, and I didn't know he wanted —
6  it didn't seem like he was there with anyone.
7  Q. How did you leave and get home from that protest?
8  A. Well, when Connor picked me up he said he wasn't sure
9  if he would bring me home, so I threw my bike in and after
10  the protest I put my bike somewhere, Jared actually rode
11  his bike there, so we both rode our bikes home together,
12  we didn't live far from each other. We just rode our
13  bikes in the same direction.
14  Q. Did there come a time after you met Connor Cash at
15  that protest and after you met Jared McIntyre for the
16  first time that you engaged in a direct action with Cash
17  and McIntyre?
18  A. Yeah.
19  Q. What was the nature of that direct action?
20  A. On December 1st, we vandalized stuff at a
21  construction site off, you know, houses under construction
22  that were unoccupied, we vandalized and spray painted
23  stuff.
24  Q. Where were those houses?
25  A. Next to Longwood High School in Middle Island.

### Page 32

1  Q. How did you get to that construction site?
2  A. Me and Jared were at another show at the same place,
3  at the Mod Center, and Connor when he got off of work
4  picked us up from there, and we drove there and he parked
5  and we went in and vandalized stuff.
6  Q. Did Connor Cash have anything in his car when he
7  picked you up?
8  A. Yeah.
9  Q. What did he have?
10  A. A hammer, spray paint.
11  THE COURT: Spray paint?
12  THE WITNESS: Yeah.
13  Q. Incidentally, do you see Connor Cash in the courtroom
14  today?
15  A. Yeah.
16  Q. Can you point him out, identify where he's seated?
17  A. In the middle of the table.
18  MR. DRISCOLL: The record will reflect that the
19  defendant has been identified, your Honor?
20  THE COURT: Yes.
21  Q. What did you do when you got to that site of the
22  partially constructed homes near Longwood High School?
23  A. We broke a lot of windows, spray painted and messed
24  around with construction machinery.
25  Q. When you say "we", who are the persons that are part

### Page 33

1  of the we?
2  A. Connor, Jared and I.
3  Q. Did you stay together or did you split apart?
4  A. We stayed together.
5  Q. How long were you there?
6  A. Forty-five minutes, an hour and a half, a long time
7  ago, but it was quite a while.
8  MR. DRISCOLL: May I approach the witness,
9  your Honor?
10  THE COURT: Yes.
11  MR. DRISCOLL: Thank you.
12  Q. Sir, I'm showing you what's been marked as Government
13  Exhibits Longwood 1 through Longwood 11.
14  (Handing.)
15  I ask you, do you recognize those?
16  A. Yeah.
17  Q. Did those photographs fairly and accurately reflect
18  vandalism and the damage that you, Cash and McIntyre did
19  on December 1st of 2000?
20  A. Yeah.
21  MR. DRISCOLL: I'd move them in evidence,
22  your Honor.
23  MR. BREWINGTON: May I just see those copies,
24  Judge?
25  THE COURT: Yes.

U.S. DISTRICT COURT, EDNY

Page 34

1 MR. BREWINGTON: Judge, my objection is to
2 relevance.
3 THE COURT: Let me take a look may I see them?
4 MR. DRISCOLL: Certainly. May I approach with
5 Mr. Brewington just to address that?
6 THE COURT: Yes.
7 MR. DRISCOLL: Thank you.
8 THE COURT: Let me see them first before I hear
9 argument on them.
10 MR. DRISCOLL: All right.
11 (Photographs handed to the Court.)
12 THE COURT: Okay, step up.
13 (Whereupon, the following occurred at sidebar.)
14 MR. DRISCOLL: Your Honor, these are the
15 photographs of the damage that the Court ruled yesterday
16 are relevant as to the conspiracy and background for the
17 conspiracy.
18 THE COURT: I understand that. What is your
19 objection?
20 MR. BREWINGTON: The objection, your Honor, is
21 these are photographs of an incident that there was no
22 testimony about.
23 THE COURT: What?
24 MR. BREWINGTON: That we have testimony, he's
25 already given testimony. These photographs are ones of

Page 35

1 uncharged crimes that are alleged to have been committed,
2 and my understanding was that they were offering this
3 testimony to try and show some common understanding or
4 connection. We already have that testimony.
5 THE COURT: The acts in connection with, I don't
6 know, that's a relevant objection. That goes in any way
7 on the conspiracy count.
8 MR. BREWINGTON: As to that, Judge, we're
9 objecting to the photographs.
10 THE COURT: Your objection is overruled.
11 MR. BREWINGTON: Very well.
12 (Whereupon, the following occurred in open
13
14 THE COURT: Exhibits 1 through 11 will be
15 received.
16 THE CLERK: Government Exhibits Longwood 1
17 through 11 are received in evidence.
18 (Government's Exhibits 1-11 received in
19 evidence.)
20 MR. DRISCOLL: Your Honor, I'd like to use the
21 Elmo system if I may.
22 THE COURT: You may.
23 MR. BREWINGTON: Can I confer with counsel for a
24 second?
25 THE COURT: You may.

Page 36

1 MR. DRISCOLL: Your Honor, there's, I believe
2 the lights are a little --
3 THE CLERK: Do you want me to turn the lights
4 down?
5 THE COURT: Do you want the witness to stand
6 down?
7 MR. DRISCOLL: I would. But I would ask that
8 the lights be turned down, because there's a certain
9 portion that I want pointed out.
10 THE CLERK: Is that better?
11 MR. DRISCOLL: I'll make it easier. I'll do it
12 through discussing it with the witness.
13 May I approach the witness, your Honor?
14 THE COURT: Yes.
15 MR. DRISCOLL: Thank you.
16 EXAMINATION (Continued.)
17 BY MR. DRISCOLL:
18 Q. Sir, I'm showing you what's been marked as Longwood 1
19 and I ask you, directing your attention to some red
20 lettering on there, do you see the red lettering that
21 appears to be in the middle of the picture?
22 A. Yeah.
23 Q. What is that symbol?
24 A. Looks like an anarchy sign.
25 Q. When you say "an anarchy sign", describe what the

Page 37

1 symbol is?
2 A. It's an A with a circle around it and it means you
3 believe in no government.
4 Q. And is it a capital A with a circle around it?
5 A. Yeah.
6 Q. Showing you what's been marked as Exhibit Longwood 3,
7 do you see any writing on that exhibit in red?
8 A. Yeah.
9 Q. Can you read what that writing says?
10 A. It says E, the letters E-L-F. And then it says "will
11 pay" under it.
12 Q. Showing you Longwood 6. Could you describe what's
13 depicted in Longwood 6?
14 A. It is windows that are broken from you know, we broke
15 them.
16 Q. Showing you Longwood 7 and 8. Does that reflect
17 graffiti that you, Cash and McIntyre did on December 1st?
18 A. Yes.
19 MR. BREWINGTON: Objection. Leading.
20 THE COURT: Sustained.
21 Q. What does it depict?
22 A. It's spray painted vandalism from what we did on
23 December 1st.
24 MR. DRISCOLL: Your Honor, if I can just publish
25 these photographs to the jury while I'm doing the

10 (Pages 34 to 37)

MARY ANN STEIGER, CSR

GA000000007

U.S. DISTRICT COURT, EDNY

### Page 38

1  examination?
2       THE COURT: You may.
3       MR. DRISCOLL: Thank you.
4       (Exhibits passed among the jurors.)
5  Q. Now, how did you get home after you completed th
6  direct action on December 1st of 2000?
7  A. Connor drove there, so he drove us home.
8  Q. Did you stop anywhere on the way home?
9  A. First we stopped at Jared's house and he was droppe
10 off and later I was dropped off.
11 Q. What, if anything, did you do at Jared's house?
12 A. Well, my pants got dirty at the site from
13 construction, and I asked Jared to go in and get me a pair
14 of clean pants so I didn't walk into my house really
15 suspicious looking, and we stayed there for a little bit
16 and Jared came out and got me a clean pair of pants.
17 Q. What did you do with the pants that you had worn to
18 the vandalism site?
19 A. I left them in Connor's car.
20 Q. Did you say anything to Connor about giving him th
21 pants?
22 A. I told him to wash them and get them back to me
23 eventually.
24 Q. Did you ever get them back?
25 A. No.

### Page 39

1  Q. When is the next direct action you took part in after
2  the vandalism on December 1st?
3  A. December 9th.
4  Q. What was the nature of that direct action?
5  A. Jared and myself rode bicycles to a site in Middle
6  Island, where there were big condos under construction,
7  you know, unoccupied, and we placed incendiary devices
8  a few of the homes.
9  Q. When you say "incendiary devices", can you explain
10 the jury what you mean by that?
11 A. Like a milk jug or other container that's filled with
12 gasoline and a sponge sprayed with aerosol in the handle
13 and then incense going into the sponge and then you wind
14 it, it lights the sponge, and melts the milk jug.
15 Q. Where did you make those devices?
16 A. Jared had them already at his house.
17      MR. DRISCOLL: May I approach the witness,
18 your Honor?
19      THE COURT: Yes.
20 Q. Showing you what's been marked, sir, as Exhibits
21 Middle Island 3, 4, 8 and 11. I'd ask you do you
22 recognize those?
23      (Handing.)
24 A. Yes.
25 Q. Are those the devices that you and McIntyre used in

### Page 40

1  the Middle Island arson on December 9th, 2000?
2  A. Yes.
3       MR. DRISCOLL: I'd move those exhibits in
4  evidence, your Honor.
5       THE COURT: 3, 4, 8 and 11.
6       MR. BREWINGTON: Just one second, your Honor,
7  I'm trying to find my copies.
8       MR. DRISCOLL: Do you want to see the originals,
9  Mr. Brewington?
10      MR. BREWINGTON: I'll see if I can find my
11 copies.
12      Objection.
13      THE COURT: You say objection?
14      MR. BREWINGTON: Different objection, Judge.
15      THE COURT: All right. Step up.
16      (Whereupon, the following occurred at sidebar.)
17      MR. BREWINGTON: These were photographs of an
18 incident about which there's been no testimony of the
19 involvement or knowledge or awareness or agreement as
20 alleged by the government of Mr. Cash. These are exhibits
21 to write there's been no connection as you previously
22 ruled that they can show some conspiracy, but this is not
23 connected.
24      MR. DRISCOLL: Your Honor, this is an action
25 that was engaged in by the cooperator not when Cash was

### Page 41

1  present, but what the government is going to elicit is
2  that these devices, this fire, this whole incident was
3  known to Cash on December 24th when he buys gas for these
4  other young men and this also will corroborate the
5  evidence of the Mt. Sinai fire on December 30th.
6       THE COURT: His objection is well-taken. You've
7  got to connect it. At that point you can offer them. You
8  can't offer them now.
9       MR. DRISCOLL: That's fine, Judge. I can offer
10 them later on, that's fine.
11      (Whereupon, the following occurred in open
12
13 EXAMINATION (Continued.)
14 BY MR. DRISCOLL:
15 Q. What time of the day did you go to the site on
16 December 9th?
17 A. Around 11:00, 12:00
18 Q. Is that in the evening?
19 A. 11:00 p.m.
20 Q. How did you get there?
21 A. We rode bikes from Jared's house.
22 Q. How long did it take you to get there?
23 A. Fifteen, twenty minutes.
24 Q. What did you do once you got there?
25 A. We placed four devices in four separate condos and

MARY ANN STEIGER, CSR

GA000000008

U.S. DISTRICT COURT, EDNY

### Page 42

1 then we lit them and then we left.
2 Q. Did the devices light on fire?
3 A. Only one of them.
4 Q. What time did you get home that night?
5 A. 12:30, around there.
6 Q. Anything happen to you when you got home?
7 A. My mom was mad and I got grounded.
8 Q. Was a communiquT sent out about that arson?
9    MR. BREWINGTON: Objection, Judge, to leading.
10   THE COURT: No. I'll allow that question.
11 A. Jared told me that he sent it out.
12   MR. BREWINGTON: Objection.
13   THE COURT: No. Overruled.
14 Q. Jared told you what, sir?
15 A. That he sent out a communiquT.
16 Q. After that December 9th arson, did you take part in
17 the manning and preparation of another arson?
18 A. Yeah.
19 Q. Where was that arson going to take place?
20 A. At a site in Mt. Sinai.
21 Q. What, if anything, did you do prior to the day of the
22 arson in preparation for that arson?
23 A. Well, we needed to make the incendiary devices.
24   THE COURT: The what?
25   THE WITNESS: The incendiary devices.

### Page 43

1    THE COURT: All right.
2 A. So we had the need to get milk jugs, gas and like the
3 sponges and birthday candles we used instead of incense at
4 this time.
5 Q. Why did you use birthday candles instead of incense?
6 A. Because the wind blew over the incense sticks out the
7 previous time.
8 Q. Drawing your attention to December 24th of 2000, did
9 you accompany anyone in the purchase of gas on that day?
10 A. Yeah.
11 Q. Where was gas purchased on December 24th, 2000?
12 A. At a Hess station in Miller Place.
13 Q. Who was present when the gas was purchased?
14 A. I was there, Jared was there and Connor was there.
15 Q. How did you get to the gas station?
16 A. Connor drove.
17 Q. What was he driving that day?
18 A. A pickup.
19 Q. Did he pick you up or did you meet him?
20 A. He picked me up and then went to Jared's and we went
21 to the gas station.
22 Q. Did Jared have anything with him at the time that he
23 was picked up?
24 A. Yeah. He put a gas container in either the bed or
25 the back of the pickup, I don't remember.

### Page 44

1 Q. What, if anything, occurred after Connor picked up
2 you and Jared on December 24th of 2000?
3 A. We drove to the Hess station and Connor said he
4 needed cigarettes and Jared got out with the container and
5 I stayed in the car, and you know, one of the two of them
6 filled it up and/or paid for it.
7 Q. Did you stay in the car at that time?
8 A. Yes.
9 Q. Did there come a time that Jared and Connor got back
10 in the car?
11 A. Yeah.
12 Q. Did you then have any conversations about arson?
13 A. We had conversations in Connor's car, but I don't
14 know, I can't relate exactly, you know, when it was that
15 day or right after we got in the car, I don't remember.
16 Q. What, if anything, did Connor Cash say about arson?
17   MR. BREWINGTON: Objection.
18   THE COURT: I'll allow it.
19   MR. BREWINGTON: When, Judge.
20   THE COURT: When they were in the car?
21   MR. BREWINGTON: What date? He's already said
22 he doesn't know, Judge.
23   THE COURT: Do you know approximately what date
24 this was?
25   THE WITNESS: We only hung out, me, Jared and

### Page 45

1 Connor a handful of times in Connor's car and a few of the
2 times we talked about direct action, politics, activism,
3 arson.
4    THE COURT: This is the first one. Do you
5 remember when that was?
6    THE WITNESS: No.
7 EXAMINATION (Continued.)
8 BY MR. DRISCOLL:
9 Q. In or around December 24th of 2000 —
10   MR. BREWINGTON: Objection.
11   MR. DRISCOLL: Judge, I haven't asked the
12 question.
13   THE COURT: Ask the question.
14   MR. BREWINGTON: Then I'll object.
15 EXAMINATION (Continued.)
16 BY MR. DRISCOLL:
17 Q. In or around December 24th of 2000, did you have a
18 conversation with Connor Cash regarding arson?
19   MR. BREWINGTON: Objection.
20   THE COURT: Overruled.
21 A. It might have been in December sometime, we talked
22 about arson.
23 Q. What did Connor Cash say?
24 A. Well, this was after we all did some first action, so
25 yeah, it was in December, Jared was saying how it would be

12 (Pages 42 to 45)

MARY ANN STEIGER, CSR

GA000000009

U.S. DISTRICT COURT, EDNY

Page 46

1 less risky to use arson instead of vandalism, it would
2 cause more damage.
3 Q. Why would it be less risky to use arson instead of
4 vandalism?
5 A. Because it wouldn't make any noise basically.
6 Breaking windows makes a lot of noise, it's easier to get
7 caught on the site.
8 Q. That was who who said that?
9 A. Jared.
10 Q. What, if anything, did Connor say?
11 A. He said yeah, it might be less risky, but, you know,
12 I'm over 18, you guys are kids, if I got in trouble with
13 that I could get in serious trouble.
14 Q. Did he say anything about what would happen to you if
15 you engaged in arson?
16 A. He said, yeah, you guys are kids, you probably would
17 get off easily.
18 Q. Did you go do a construction site in Mt. Sinai in
19 December 30th of 2000?
20 A. Yeah.
21 Q. Why did you go to that construction site?
22 A. Why?
23 Q. Yes.
24 A. Because we had all the materials for the next arson
25 and me and Jared rode bicycles there.

Page 47

1 Q. What did those materials include?
2 A. The empty plastic containers with, filled with gas,
3 sponges and trick birthday candles.
4 Q. What did you do when you got there?
5 A. And spray paint.
6 Q. What did you do when you got there?
7 A. We set the incendiary devices, spray painted a little
8 bit, and then lit the fuses and we left.
9 Q. Did any of the devices actually catch fire?
10 A. Yeah.
11 Q. How many devices caught fire?
12 A. I don't know, a couple.
13 Q. Did you send a communique after that direct action?
14 A. Yes.
15 Q. Did you personally send a communique?
16 A. Yeah.
17 Q. After the Mt. Sinai arson, did you plan to engage in
18 any other direct actions?
19 A. Yeah.
20 Q. What did you plan to do?
21 A. At McDonald's in Miller Place we planned to set fire
22 to.
23 Q. Did you actually set fire to the McDonald's at Miller
24 Place?
25 A. No.

Page 48

1 Q. Why not?
2 A. Well, when we got there, me and Jared went and rod
3 bikes, and when we got there, there was someone riding
4 their bike that we thought would call on us and in the
5 parking lot and we weren't sure, I mean McDonald's was
6 closed but we weren't sure, we couldn't go in there and
7 see if anyone was in there so we didn't want to take any
8 risk of doing anything to it if anyone was in there so we
9 decided to back down at the last minute.
10 Q. And what did you do then?
11 A. And Jared said, you know, Wendy's is across the
12 street, let's go look over there. And we went over there
13 and that place was closed, too, but there was a radio on
14 inside, so we decided not to do that either.
15 Q. Did you ever commit a direct action then?
16 A. Yeah.
17 Q. What did you do?
18 A. Next to Wendy's was a place called Milo's
19 Construction, and Jared noticed it and he said wait right
20 here, let me go look what this place is and he went and
21 looked and saw a bunch of construction vehicles and he
22 came back and said all right, we have all the materials
23 here, let's do this place instead.
24 Q. And did you do anything?
25 A. Yeah.

Page 49

1 Q. What did you do?
2 A. We set fire to two vehicles.
3 Q. Is that the last direct action in which you
4 participated as an affiliate of EFL?
5 A. Yeah.
6 Q. Now, you testified earlier that you pled guilty
7 pursuant to a cooperation agreement, right?
8 A. Yes.
9 Q. Have you been sentenced yet?
10 A. No.
11 Q. What's the minimum sentence you face without a
12 cooperation letter?
13 A. Five years, fees and restitution.
14 Q. What's the maximum sentence you face?
15 A. Twenty years and restitution.
16 Q. What are your obligations under the cooperation
17 agreement?
18 A. To cooperate with the government and if you want me
19 to testify, you know, testify truthfully.
20 Q. If you fulfill your obligations, does my office, the
21 office of the United States Attorney, have an obligation?
22 A. Yeah.
23 Q. What is that obligation?
24 A. To write a 5K1.1 letter to the Judge allowing him to
25 sentence me less than the mandatory minimum of five years

13 (Pages 46 to 49)

MARY ANN STEIGER, CSR